Kernick, Appellant, *v.* Dardanell Press.

Argued September 28, 1967. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*William J. Tarter,* for appellant.

*Ivan E. Birsic,* with him *Cauley, Birsic & Clarke,* for appellees.

*Herbert Grigsby,* with him *Pringle, Bredin, Thomson, Rhodes & Grigsby,* for appellees.

1967:

Opinion by Mr. Justice Musmanno, November 28,

The plaintiff in this case brought a suit in trespass charging the defendant, Dardanell Press, and others, with libel. The defendants filed preliminary objections which were sustained by the Court of Common Pleas of Allegheny County, and the plaintiff appealed.

The plaintiff, Mrs. Phyllis T. Kernick, is the elected auditor of the township of Penn Hills, and functions as such. It appears that some time in April, 1966, Mrs. Kernick had a conversation with one of the township commissioners, George Taylor, III, who allegedly said to Mrs. Kernick that the commissioners would build a road into her property if she went "easy on the audit." At a meeting of the commissioners on June 7, 1966, Mrs. Kernick referred to this asserted conversation. At a subsequent meeting of the commissioners on July 11, 1966, Mrs. Kernick again commented on the colloquy with Taylor who now explained that whatever he had said to Mrs. Kernick was spoken in jest.

Nevertheless, three of the board of commissioners, Charles Williams, Alfred C. Ireland and Wm. Tobay, asked the District Attorney of Allegheny County to investigate into Mrs. Kernick's charges to ascertain if Commissioner Taylor had conducted himself in such fashion as to warrant initiation of criminal prosecution. The district attorney, after an appropriate investigation, reported that he found nothing to justify criminal proceedings against Taylor.

On August 23, 1966, the three named commissioners issued a statement stating that Mrs. Kernick had "failed to substantiate her outrageous accusation." They said further that her remarks had "carefully calculated to disparage the Township and its officials," that her utterances cost the taxpayers money in order to conduct an investigation of her charges, "even though

they consistently turn out to be baseless," that her "peculiar actions in suppressing the facts" were unexplained, that she owed the township "an explanation of her actions," and that finally, "we hope that in the future Mrs. Kernick will conduct herself in a manner befitting an elected public official."

A newspaper entitled "The Progress" and published by the Dardanell Press, printed the commissioners' statement, as well as a story on the district attorney's investigation. The plaintiff felt herself injured and brought suit in libel against the owners of the newspapers, the editor-in-chief of the newspaper, and the three named commissioners. As already stated, the court of common pleas sustained the preliminary objections filed by the defendants, declaring that the plaintiff had failed to state a cause of action.

It appears that Mrs. Kernick did not know of former President Harry S. Truman's oft-quoted remark that "If you can't stand the heat, stay out of the kitchen." The statement issued by the commissioners may have caused the political pot to boil in Penn Hills township, but it is not apparent that it boiled at such temperature that it blew off the top and scalded Mrs. Kernick, or even burned her to any traumatic extent. The person who is the target of unkind words is bound to feel hurt, but he or she often exaggerates in his or her mind the extent of the damage done to his or her reputation in the public mind. The public has many things to think and talk about, and it does not linger on a debate which may occur at a township commissioners' meeting or on a statement issued by commissioners in the heat of an altercation.

Whatever sensation the commissioners' statement may have caused could not have endured for any appreciable period. It could be compared to the ripples in the water caused by the passing of a rowboat, which rippling quickly tranquilizes after the dipping oars have ceased their momentary agitation. A minute

later, there is nothing written in the water to suggest what had blithely passed over its serene surface. Thus, had it not been for Mrs. Kernick's lawsuit, it is to be doubted whether there would be many in Penn Hills township who could fish out of the pools of their memory the details of the Kernick-Commissioners dispute.

Mrs. Kernick felt herself offended by the assertion that she should "conduct herself in a manner befitting an elected public official." What *is* the manner befitting public officials? No Emily Post has laid down a code of manners for elected public officials. And is there a different code for *appointed* public officials? If there is one field that is as empty as a football gridiron after the teams have left and the tumult has died away, it is the field of manners befitting public officials. There is no specified code on this subject, although, obviously, there are certain rules built up over the years indicating what is generally proper and improper in public officialdom. The commissioners, however, in no way indicated how, or if at all, Mrs. Kernick had deviated from any implied code of propriety.

If the statement of the commissioners had accused Mrs. Kernick of dishonesty or of incompetence in her work, the situation could have been different. Mrs. Kernick is entitled to the protection of her good name:

"Good name in man and woman, dear my lord,
Is the immediate jewel of their souls:
Who steals my purse steals trash; 'tis
    something, nothing;
'Twas mine, 'tis his, and has been slave
    to thousands;
But he that filches from me my good name
Robs me of that which not enriches
    him,
And makes me poor indeed."[1]

---

[1] Othello, Act III, Sc. III.

The law stands as a guardian to protect a man's good name earned in the heat of battle, in the sweat of work, and in the laboratory of conscience, but it cannot prescribe hospitalization for abrasions or order surgery for a hiccough.

Commissioner Taylor explained that the remark attributed to him by Mrs. Kernick was spoken in jest. It could have been humor on the oblique, but there is some rationalization to support his non-scintillating bon mot, since the audit Mrs. Kernick was conducting was that of 1965 and Taylor was not a commissioner in 1965. Thus, he had nothing to hide by building a road over it.

If Taylor was joking, he is not the first person who failed to heed the admonition of Cicero, that "one should be moderate in his jests." To tell a fiscal officer to wear dark glasses when checking returns is to spring a joke that can backfire. It would appear that the attorney for the plaintiff has, himself, indulged in some whimsical badinage when he says in his brief that the defendants' use of the word "Auditor," was "a deliberate play on words." He suggests that the public did not know whether the statement referred to Mrs. Kernick as an auditor, that is one who listens, or an auditor, one who examines accounts. Obviously, the statement was referring to Mrs. Kernick's official position as auditor of Penn Hills township, and not as a listener to the poor jokes related by Commissioner Taylor.

Even so, Mrs. Kernick never explained why, if she regarded Taylor's alleged quips as an attempt to improperly influence her in her work, she waited from April to June to inform the board of township commissioners of Taylor's alleged whisperings of a highway under the Christmas tree of promise, if she looked at the ceiling while auditing the *Commissioners'* books of 1965.

The court below concluded that, even accepting the averred facts to be true, the complaint did not set out a cause of action.

In *Richwine v. Pgh. Courier Pub. Co., Inc.,* 186 Pa. Superior Ct. 644, the Superior Court approved the definition of libel as given in the lower Court, namely, " 'Libel may be defined as any malicious publication, written, printed or painted, which, by words or signs, tends to expose a person to ridicule, contempt, hatred or degradation of character. Where the words are not in themselves libelous, as in this case, but are of dubious import and their meaning is averred by innuendo, the truth of the innuendo is for the jury. However, whether or not the writing is fairly or reasonably capable of being found libelous in nature is a question of law for the court, and only after such question has been resolved does it then become a question of fact for the jury.' "

The Superior Court then said: "The function of the court and jury set forth in the Restatement of the Law, Torts, Section 614, '(1) The court determines whether a communication is capable of a defamatory meaning. (2) The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient.' "

Certainly in the case at bar the question as to whether the controverted statements were libelous in nature was a question of law for the Court. In *Sarkees v. Warner-West Corporation,* 349 Pa. 365, 37 A. 2d 544, this Court said: " 'It is the duty of the court in all cases to determine whether the language used in the objectionable article could fairly and reasonably be construed to have the meaning imputed in the innuendo. If the words are not susceptible of the meaning ascribed to them by the plaintiff and do not sustain the innuendo, the case should not be sent to a jury.' "

Chief Justice BELL, in recently expounding the law of libel in the case of *Clark v. Allen,* 415 Pa. 484,[2] quoted with approval what was said in *Volomino v. Messenger Publishing Co.,* 410 Pa. 611: "In a defamation case, it is the function of the court, in the first instance, to determine whether or not the communication complained of is capable of a defamatory meaning.' "

And then said: "Notwithstanding the fact that the law of libel has been well settled for a long period of time, the Supreme Court of the United States has recently greatly broadened the concept and meaning of freedom (of the press and freedom) of speech and has greatly narrowed the meaning of libel when applied to a public official or a candidate for public office. See New York Times v. Sullivan, 376 U.S. 254."

Chief Justice BELL then quoted from the *New York Times* case: " 'A state cannot under the First and Fourteenth Amendments award damages to a public official for defamatory falsehood relating to his official conduct unless he proves "actual malice"—that the statement was made with knowledge of its falsity or with reckless disregard of whether it was true or false.' "

In a concurring Opinion in the *Clark v. Allen* case, Justice JONES said: "In my view, New York Times Company v. Sullivan, 376 U.S. 254, 84 S. Ct. 710, commands this result."

The statements made by the commissioner defendants in the case at bar do not come within any of the definitions of libel in the law of libel as accepted today. Nor is there the slightest evidence in the record that

---

[2] In that case, Senator Joseph S. Clark brought an action of libel against three persons who had written and circulated a letter in which they made the statement: "We are shocked at Joe Clark's record on Senate absenteeism and his A.D.A. approved voting record with its communist tendencies."

*The Progress* was motivated by any malice against the plaintiff. The two articles, of which the plaintiff complains, were factual and unencumbered by any demonstrated bias, they were without coloring of the chronicle of events unfolded in the happening of the episode in discussion, and were completely devoid of adjectival or adverbial description, comment or observation, which can at times turn fact into tortious fiction.

The court below properly appraised this entire episode as a tempest in a fish bowl or a hurricane in a teapot, and its judgment is affirmed.

Mr. Justice EAGEN and Mr. Justice O'BRIEN concur in the result.

---

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

Contrary to the majority opinion, I do not believe that this case is controlled by *New York Times v. Sullivan,* 376 U.S. 254, 84 S. Ct. 710 (1964). Although the case clearly involves the alleged defamation of a public official, and although I am well aware that *Times v. Sullivan* requires such a plaintiff to prove that the libel was perpetrated with actual malice (i.e., with knowledge that the statement was false or with reckless disregard of whether it was false or not), nevertheless I wish to make it quite clear that *Times v. Sullivan* made no change in our substantive law as to what statements constitute libel, but was merely directed to the plaintiff's burden of proof in cases involving alleged defamation of a public official. Since the present appeal comes to us from the lower court's sustaining of defendant's preliminary objections, we must accept, as true, all the factual allegations in plaintiff's complaint. Paragraph 14 of that complaint recites: "14. All charges made by the Defendants in and by said writing made against the Plaintiff are false and *all Defendants well knew said charges to be untrue when made.*" (Emphasis supplied.) Without question,

this allegation, if proven at trial, would satisfy the *Times v. Sullivan* requirement of actual malice as the Supreme Court of the United States has defined the term.

Nevertheless, I agree with the majority that the lower court properly sustained these preliminary objections, but I do so on the sole ground that the defendant's article is not libelous as a matter of law. As this Court said in *Bausewine v. Norristown Herald,* 351 Pa. 634, 643, 41 A. 2d 736, 741 (1945) : "It [is] for the court to say, as a matter of law, whether the writings in suit [are] capable of a libelous meaning. If they [are], it then [becomes] the jury's duty to determine whether they [have] such meaning in fact." The Restatement of Torts also recites that "[t]he court determines whether a communication is capable of a defamatory meaning." Restatement, Torts, §614(1).

The most precise statement of Pennsylvania's law on the issue of when a remark directed toward a public officer can be libelous is found in Judge BIGGS' opinion in *Sweeney v. Philadelphia Record Co.,* 126 F. 2d 53 (3d Cir. 1942). In that diversity action plaintiff based his complaint on a newspaper article which charged that plaintiff, an Ohio Congressman, had been leading a campaign to prevent a certain individual's appointment to the federal bench because the prospective jurist was "a Jew and one not born in the United States." In affirming the trial court's sustaining of defendant's demurrer, Judge BIGGS said: "In short under the law of Pennsylvania in order to constitute libel per se the misconduct asserted in the published matter must be of a criminal nature or at least such as would warrant the removal of the public officer from his office or render him an improper person to hold public office. The misconduct alleged by the libel must really be in derogation of the oath of office taken by the public officer." 126 F. 2d at 54-55. This test, especially

when considered in conjunction with those cases finding a statement capable of being libelous, convinces me that the article here challenged cannot support this lawsuit. Compare *Clark v. Allen,* 415 Pa. 484, 204 A. 2d 42 (1964) (statement that senator's voting record had Communist tendencies held not libelous) and *Weiscarger v. Wilkes-Barre Independent Co.,* 75 Pa. D. & C. 481 (Luzerne County C.P. 1950) (statement that plaintiff-city controller had threatened that "city hall would keep a watchful eye on the business" if X-businesswoman did not fire Y, plaintiff's political adversary, held not libelous), with *Thompson v. Farley,* 35 Pa. D. & C. 2d 157 (Bucks County C.P. 1964) (statement accusing plaintiff of bribery and extortion found capable of being libelous), *Turner v. Intelligencer Co.,* 17 Pa. D. & C. 2d 236 (Montgomery County C.P. 1959) (facts similar to *Thompson,* supra), and *Battles v. Record Publishing Co.,* 40 Erie Cty. L.J. 132 (C.P. 1956) (LAUB, J.) (newspaper article charging plaintiff-policeman with drinking beer in a speakeasy during duty hours held capable of a defamatory meaning).

In the present case, the newspaper article alleged to be libelous is nothing more than an accusation that plaintiff is over-zealous, over-suspicious, and is thus wasting taxpayers' money by stirring up needless investigations. The article is critical, but it does not even come close to charging plaintiff with such acts as would lead to her removal from office. As this Court said in *Bogash v. Elkins,* 405 Pa. 437, 440, 176 A. 2d 677, 679 (1962) : "Statements which represent differences of opinion or are annoying or embarrassing, are, without more, not libelous." Plaintiff, however, alleges that there is "more" here. Her complaint invokes the theory of innuendo whereby a seemingly innocuous remark can become libelous because of certain inferences that the public would naturally draw from it. Specifically, she claims that a reader of this article would as-

sume that the criticism was actually directed against her performance as a township auditor, rather than against her over-suspicious nature. I cannot agree that such an inference is reasonable. Even a cursory reading of this article would convince any reader that the attack was *not* aimed at plaintiff's performance of her official duties as auditor. An innuendo must be warranted, justified and supported by the publication. *Bogash v. Elkins,* supra; *Sarkees v. Warner-West Corp.,* 349 Pa. 365, 37 A. 2d 544 (1944). This one is not.

As Mr. Chief Justice MAXEY said in *McAndrew v. Scranton Republican Publishing Co.,* 364 Pa. 504, 72 A. 2d 780 (1950), "[n]ot every lie is a libel." With this artfully turned phrase I heartily concur.